WHITNEY-ELLSWORTH COMPANY, *Appellant*, v. ANDERSON MERCANTILE COMPANY, *Respondent*.[1]

*Schwellenbach, Merrick & Macfarlane*, for appellant.
*Grinstead, Laube, Laughlin & Meakim* and *Alfred Harsch*, for respondent.

TOLMAN, J.—This is an action to recover for the conversion of certain salmon cans and tops alleged

[1]Reported in 294 Pac. 548.

to have been the property of the plaintiff and of the reasonable value of $1,506.12 when converted. The case was tried to the court sitting without a jury, resulting in a judgment denying relief and dismissing the action with prejudice. The plaintiff has appealed.

It appears that appellant was engaged in the brokerage business representing those engaged in the canning of fish and marine products, and as such, on March 1, 1928, it entered into a written contract with one W. A. Keller, who operated a cannery near Seldovia, Alaska, for the handling of his pack for that year. The written contract, among other things, provides that Keller constitutes appellant as his sole and exclusive selling agent for the sale of his 1928 pack, and agrees that he will not sell any of the fish products packed by him during said season to or through any person other than appellant. It fixes the terms upon which appellant shall sell the products, provides for five per cent brokerage commission and other customary allowances, and:

"The first party (Keller) agrees that, should any of his fish products packed during the year 1928 be sold to any other person, firm or corporation, or through any broker other than the second party, that he will pay to the second party the same commissions as hereinabove provided on the products thus sold as if the same had been sold by the second party under this contract."

Appellant, the broker, covenanted to sell the products at the best price obtainable, and that its officers and employees would exercise their best judgment and efforts in procuring the best possible return for the products sold under the contract. It is further provided that Keller is indebted to one Rubenstein in the sum of $1,400, secured by mortgage on five hundred cases of cans, and is indebted to Hoagland Bros. in a considerable sum secured by mortgage on the gas

boat "Margaret," and it is provided that, out of the first pack delivered to and sold through the appellant, Rubenstein and Hoagland Bros. are to be paid, if sufficient money is thus realized, and if not, they shall be paid out of later packs. It is further recited that Schwabacher Hardware Company has extended to Keller a credit of $1,000, and it is agreed that, from the sale of the products under the contract, appellant shall pay to Schwabacher Hardware Company the amount of its advances. Paragraph 5 of the contract reads:

"It is further understood and agreed that the second party is to furnish to the first party cans as needed up to approximately 7,000 cases; and it is understood and agreed that on all cans furnished by the second party, that the title to said cans and the contents thereof as packed shall at all times remain in the second party, and that any use thereof by the first party shall be only as trustee for and on behalf of the second party, and that nothing herein or hereafter done by the parties hereto shall be construed to permit the first party to sell or dispose of the said cans or the contents thereof, or to cause them to be encumbered by any labor, tax or material liens."

It is further provided, "after the sale of the products," probably meaning the whole season's pack, that appellant shall deduct from the moneys received by it the amount paid out to others as hereinbefore indicated and:

". . . thereafter it shall deduct the amount expended by it for the purchasing of cans, plus the cost of shipment thereof to the first party in Alaska, plus insurance and freight costs, and storage costs, in the city of Seattle, plus any other expenses to which it may be put under the provisions of this contract, plus any and all advances heretofore or hereafter made by it to the first party, with interest thereon at the rate of 7% per annum from the date of the advancement until reimbursement; and that it may deduct its com-

mission and brokerage charges as hereinabove provided; thereafter it may deduct sufficient to pay Schwabacher Hardware Company; and second party agrees thereafter to account to the first party for all moneys remaining.''

The final paragraph of the contract provides that appellant shall not be limited in the receipt of the amounts due it by the amount of funds received through sales, but that, if enough is not so realized with which to pay all advances made, Keller will pay to second party the amount so advanced on or before December 31, 1928, with interest.

Matters proceeded regularly under the contract until, in July, 1928, Keller foreseeing the need of more cans, appellant, at his request, purchased and caused to be shipped to Keller at Seldovia the cans in question, charging the cost thereof to Keller's account under date of July 20, 1928. Upon arrival there the cans were delivered at the dock of one R. V. Anderson, doing business as Anderson Dock Company.

At that time the respondent (having no connection with the dock company) was engaged in the general merchandise business at Seldovia, and Keller was indebted to it to the extent of some $3,500, much if not all of which was overdue. Respondent was then pressing Keller for payment or security. Knowing something of appellant's relations with Keller, on August 2, 1928, respondent wired to appellant, ''Have bank wire thousand dollars or Keller's credit discontinued.'' It does not appear that any direct answer to this wire was ever sent, but on August 8, appellant wired Keller:

''Sorry cannot finance you further account necessity financing our own operations stop salmon shipped will just about pay our account without taking care Hoagland Schwabacher stop suggest you arrange Anderson advance us enough pay Hoagland in order

free boat which with cans on hand should give Anderson enough security finance your fall packing stop.''

It is made very plain by the testimony that by the reference to ''cans on hand'' was meant the cans then at Keller's cannery, and not the cans at the dock at Seldovia.

Learning that Anderson of the dock company had attached the shipment of cans to secure freight and handling charges, and assuming that the Anderson Dock Company and the respondent Anderson Mercantile Company were one and the same concern, appellant on August 21 wired to respondent:

''Understand 1,000 cases our cans now on hand your warehouse, freight wharfage and storage unpaid. Have you facilities for storing these cans until next year for us. Wire cost of storage if you can handle it.''

This was answered under date of August 23 by telegram reading:

''What equity has Keller in these cases. We believe you have collected cost of cans from fish. Dock attaching them for charges $463. If you pay charges, plus costs of attachment, will store them free excepting cost of handling.''

And to that telegram appellant wired its reply on August 25, reading:

''Keller has no equity cans. We will pay charges. Draw draft on us with itemized statement attached. Thanks for taking care of this for us.''

There is some doubt as to whether the last quoted telegram was received by the respondent prior to its obtaining the bill of sale from Keller, which we are about to discuss, and we shall assume that it was not so received. At any rate, under date of August 25, 1928, respondent obtained from Keller a bill of sale of the cans at the Seldovia dock as security for its claim against Keller, but the bill of sale contained no

warranty of title, and concededly no consideration then passed. At the most, only Keller's interest, if any, passed to the respondent by the bill of sale.

■ Without detailing other facts which bear somewhat in the same direction, it seems sufficient to say that respondent was not an innocent purchaser for value, because it had notice by the telegram of August 21 that the appellant claimed title to the cans, and it parted with nothing and gave no consideration for the bill of sale from Keller. At the most, respondent acquired only what Keller then had, and by the bill of sale was placed in his shoes, so that the contract is to be construed only with reference to the rights of the parties thereto. If Keller had title to, or an interest in, the cans, that title or interest passed to respondent. If, as between the parties to the contract, Keller had no such right then nothing passed to the respondent.

■ Considerable argument is advanced to the effect that there is something vicious or unfair about the contract or that its terms are such as to be unenforceable. This argument we cannot follow. As we read the contract, and considering it as a whole, it is fair to both parties, and has only such provisions for the security of the party making advances as are customarily required in doing business with one who has insufficient capital and must do business on the advances of others.

Whether the first quoted provision means that no sales shall be made except through the broker, and fixes the payment of the broker's commission, in any event, as a penalty for a violation, or, as argued, it is a license to sell to anyone if the brokerage be paid to the appellant, we need not determine; because the second quotation fixes the rights of the parties in and to the cans to be furnished without reference to what has gone before. We are not particularly concerned

as to what name be given to the arrangement regarding the cans. Appellant argues that it is a bailment—probably it is. The trial court at first called it a conditional sale, but to us it does not seem to be that. Respondent seems to prefer not to give it a name and so do we. Not being concerned with the lien rights of laborers who might fill the cans or the rights of purchasers without notice and for value, but being only concerned with the rights of one who took whatever Keller might have to secure a pre-existing debt, we have nothing to do but to apply the plain terms which the parties agreed upon.

The trial court also came to that conclusion, but seems to have reached a wrong result by reason of the fact that on December 31, 1928, with these cans charged against Keller on the books of appellant, those books showed no balance then due from Keller. Consequently, the trial court concluded that the cans had been paid for by Keller under the terms of the contract. If, in fact, the cans were so paid for, the trial court was right, but if they were never paid for, a wrong result has been reached. The trial court seems to have overlooked a certain line of wholly uncontradicted testimony which is to the following effect: Keeping books in a brokerage business necessarily calls for many contingent entries. When a broker finances a packer, the items posted to the account are contingent upon so many things that no one can tell at any given moment which is indebted to the other. Of course, as cash was expended by the broker for Keller, the items were charged to him on its books, and there was certainty as to those items, because the cash was advanced or expended.

But at the same time the broker might have contracted for his principal many other items, insurance, freight and what not, the amounts of which were unde-

termined; and although the broker had become liable and his principal had become liable to him by reason of that liability, yet the amount could only be determined when the time came for the broker to pay the charge. So, also, on the credit side, the broker might sell a consignment of goods to a purchaser to be paid for in sixty or ninety days, and, in order to have a record of the transaction, would immediately credit the Keller account with the amount of the sale, but Keller would not be entitled to that money until it was actually collected, and it might never be collected in full. Allowances to purchasers for defective goods such as puffed and overfilled cans was a common occurrence.

At the date when the trial court thought appellant's book account with Keller showed that Keller had paid for the cans, there were a large number of these outstanding items necessary to be brought to a conclusion before final entries could be made showing the exact situation between the parties. When all of these matters relating to the 1928 pack, which is the pack covered by the contract, were finally concluded and the correct amounts charged and credited, it appears without dispute that, on the season's business, Keller owed the appellant $1,172.68, and had therefore failed to pay for these cans by that amount. The trial court found that the cans were of the reasonable value of $1,196.64 in Seattle, and by reason of freight were of the reasonable value in Seldovia of $193.44 in addition to that sum.

It appears, therefore, that, if appellant were litigating the issues of this case directly with Keller, under the terms of the contract which we have quoted, Keller would be entitled to plead as an offset anything which he had in fact paid on account of the cans, or anything which was due him under the contract, and as against

him, appellant could only recover the net unpaid balance under the terms of its contract. Since respondent has placed itself in Keller's shoes, it ought to be entitled to the same advantages, and therefore, for the conversion, appellant should recover only the net balance of $1,172.68, which represents the value of its interest in the cans.

The judgment appealed from is reversed with directions to enter judgment in favor of the appellant and against respondent accordingly.

MITCHELL, C. J., HOLCOMB, PARKER, and MAIN, JJ., concur.